IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHANICQUA BRYANT,<br>    Plaintiff,<br><br>    v.<br><br>POTTSGROVE SCHOOL DISTRICT and<br>ANN MARIE LUCAS in her personal and<br>official capacities,<br>    Defendants. | | CIVIL ACTION<br><br><br><br>No. 25-3140 |

## MEMORANDUM OPINION

Plaintiff Shanicqua Bryant ("Bryant"), proceeding *pro se*, sued the Defendants Pottsgrove

School District (the "School District" or "District") and Dr. Ann Marie Lucas ("Lucas").

Defendants have filed a Motion for Summary Judgment, *see* Fed. R. Civ. P. 56,  for each of the

claims alleged: (1) constitutional claims against both the District and Lucas, pursuant to 42

U.S.C. § 1983, for a violation of Bryant's Fourteenth Amendment due process rights; (2)

retaliation claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, also

against both Defendants; and (3) claims against Lucas in her personal capacity for the torts of

intentional infliction of emotional distress, defamation, and false light under Pennsylvania law.

For the following reasons, the Motion shall be granted.

## I.      FACTUAL BACKGROUND

The following facts are undisputed. [1]

Bryant is the mother of Dayontae Hoskins ("Hoskins"), who, in September 2024, was a

---

[1] Bryant did not respond to Defendants' February 9, 2026, Motion for Summary Judgment, even after this Court's June 1, 2026, Order requiring her to do so.  Because she failed to address the Defendants' assertions of fact, those facts are considered undisputed for the purposes of this Motion.  *See* Fed. R. Civ. P. 56(e).

1

student at Pottsgrove Senior High School, eligible for out-of-district attendance through the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11431 *et seq.* Hoskins, as a student with disabilities, received special education services and had an individualized education program ("IEP") in place for the 2024-2025 school year, as is required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The IEP provided, among other things, that Hoskins would have a one-on-one paraeducational aide who would accompany him to his classes and around the school each day. It also required the District to contact Bryant for any matters involving Hoskins that may warrant disciplinary action. The District did not, however, provide any transportation services for Hoskins. Although these services had been offered several times, Bryant declined, opting instead to pick Hoskins up each day, or—if she could not make it— secure alternative transportation for him.

On Friday, September 6, 2024, at the end of the school day, Hoskins's aide escorted him to the front door of the High School, as normal, where the aide said goodbye to Hoskins. Unbeknownst to the District at the time, when Hoskins left school that day, he did not return home.

The following Monday, September 9, 2024, Hoskins did not arrive at school. A District employee emailed Bryant, asking, for planning purposes, if they should expect him that day. Bryant replied via email, "I haven't heard from him or seen him since he called me Friday from school. The principal is checking with his Para to see what happened Friday when he left school." Another District employee spoke with Bryant that morning by phone, and after learning that Hoskins was missing, told her to contact the police immediately.

Over the next few days, School District employees, including Lucas, who is the Director of Pupil Services for the District, exchanged a series of emails and telephone calls with Bryant.

2

As part of their efforts to locate Hoskins, the District checked its security cameras, which showed Hoskins leaving school and walking off campus on the day he disappeared and tried—unsuccessfully—to GPS trace Hoskins's school-issued computer.  It also contacted his probation officer but did not contact Bryant before doing so.  Although the District asked Bryant several times if Hoskins had returned home—Lucas asked by email "Is Dayontae back home? . . . We want to ensure he is safe and accounted for. . ." and "Is Dayontae back home with you now is my immediate concern. . . ."  Bryant did not respond to these questions, or the District's inquiries into whether she had contacted the police.  Her replies focused on trying to find out what happened when Hoskins left school that Friday and why the District had contacted his probation officer without her permission.

Meanwhile, Bryant had been undertaking her own efforts to locate Hoskins.  She also called Hoskins's probation officer—which is how Bryant learned the District had contacted her without discussing the matter with her first.  Bryant also reached out to Hoskins's social worker and her local police department in Pottstown to make a runaway report.  She did not share these efforts with the District.

By Thursday, September 12, 2024, with Hoskins still missing, Bryant filed an IDEA Complaint ("IDEA Complaint") against the District, challenging its failure to abide by Hoskins's IEP.  In that complaint, she sought clarification regarding dismissal procedures, as well as a determination that the District violated the IEP when it contacted Hoskins's probation officer without first notifying her and discussing the issue.

The following week, Hoskins still had not returned to school.  Toward the end of that week, however, a teacher overheard another student discussing Hoskins's activity on social media.  Christopher Stein ("Stein"), Pottsgrove's Senior High School Assistant Principal,

followed up with that student.  The student had no information about where he was, and the District was no closer to locating him.  After discussing the matter with Lucas, and at her direction, on Friday, September 20, 2024, Stein called the Lower Pottsgrove Police Department to share this information with them.  The District did not contact Bryant before doing so, nor did it tell her it had received additional information about her son.

The Lower Pottsgrove Police Department report documents the phone call from the District, noting that it was a noncriminal "incident," and states, in relevant part:

> I received a phone call request from . . . the Assistant Principal at Pottsgrove Senior Highschool [sic]. . . . he stated that the student, Dayontae Hoskins hasn't been in school since 09/06/2024.  [He] further stated he reached out[2] to Dayontae's mother, Shanicqua Bryant who was not forthcoming with information on where Dayontae was.

The officer, following up on Stein's call, spoke to Bryant several times by phone.  Bryant was angry that the District contacted the police and refused to answer the officer's questions.  In one of the calls, Bryant told the officer that she had already contacted her son's probation officer and made a runaway report with the Pottstown Police Department.  The officer closed the matter, noting that "no further action" was required.

On Monday, September 30, 2024, Hoskins appeared at school, arriving on a bus from Philadelphia with no explanation of his three-week disappearance.  Bryant learned about his return from the School District—Hoskins had not gone home first or told his mother where he had been.

In early November 2024, a Due Process Hearing was held on Bryant's IDEA Complaint.  During Bryant's cross-examination of Lucas, Bryant twice accused Lucas of "lying."  The first

---

[2] Based on the testimony from the November 2024 IDEA Due Process Hearing, this appears to be incorrect.  Other District personnel had been in touch with Bryant, not the assistant principal himself.

involved the process Bryant and the District went through before Hoskins was enrolled for that school year, and the second concerned the sequence of emails and phone calls Lucas and Bryant exchanged in the first few days after Hoskins went missing. The Hearing Officer issued a written Final Decision and Order, which found that the District's dismissal procedures did not violate Hoskins's IEP, nor was he denied a Free Appropriate Public Education ("FAPE"). The Hearing Officer did find, however, that the District procedurally violated the IEP by contacting Hoskins's probation officer, and ordered the District to provide in-service training to remedy this issue.[3]

## II.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead [s]he must show where in the record there exists a genuine dispute over a material fact." *Id.* at 256 (citing *Celotex*, 477 U.S. at 322-26). However, the non-movant is "entitled to all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993).

The non-moving party must present something more than mere allegations, general

---

[3] In the Due Process Hearing, Bryant also argued that the District retaliated against her for filing the IDEA Complaint, but the Hearing Officer expressly excluded that issue from the scope of his review.

denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Loc. 825, Int'l Union of Operating Eng'rs, AFL-CIO,* 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982).  It is not enough to discredit the moving party's evidence; the non-moving party is required to "present *affirmative* evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 257 (emphasis in original).  A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See Anderson,* 477 U.S. at 249-50.  If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex,* 477 U.S. at 323.  Nevertheless, as is the case here, "[a]n unopposed summary-judgment motion is not tantamount to a default judgment, because the court still must find for itself that there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law." *United States v. Brace*, 1 F.4th 137, 143 (3d Cir. 2021).

## III.    DISCUSSION

Bryant's remaining federal claims are against both the District and Lucas, for a violation of her Fourteenth Amendment due process right, *see* U.S. Const. amend. XIV; 42 U.S.C. § 1983, and for Section 504 retaliation, *see* 29 U.S.C. § 794.  Her state law claims against Lucas in her individual capacity are for defamation, false light invasion of privacy, and intentional infliction of emotional distress.

### A.  Due Process

Bryant's Fourteenth Amendment claim is cognizable under 42 U.S.C. § 1983, which requires her to demonstrate: "(1) a person deprived him of a federal right; and[,] (2) the person who deprived him of that right acted under color of state or territorial law." *Groman v. Twp. of Manalapan,* 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

6

Defendants do not dispute that the state-action requirement is met.  Thus, the only issue to be decided is whether their conduct deprived Bryant of her due process rights.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  "The first step in analyzing a due process claim is to determine whether the asserted individual interest . . . is encompassed within the Fourteenth Amendment's protection of life, liberty, or property."  *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (cleaned up).

As mentioned above, Bryant does not specify the nature of the deprivation she suffered, but reading her complaint liberally it appears that her Due Process claim is grounded in what she refers to as the "false police report filed against [her]."[4]  Assuming, *arguendo*, that the police report was false—an assertion which the Defendants vigorously contest, "the filing of a false police report is not itself a constitutional violation."  *Jarrett v. Township of Bensalem,* 312 Fed. App'x. 505, 507 (3d Cir. 2009).  Although there is no binding Third Circuit precedent, other circuits have reached the same conclusion.  In *Landrigan v. Warwick,* 628 F.2d 736, 744 (1st Cir. 1980), the First Circuit reasoned that, absent some resulting deprivation of life, liberty, or property, the mere existence of an inaccurate report is not itself a constitutional violation.

> It seems to us that the focus of plaintiff's complaint is the allegedly false charge pending against him—the police reports are mainly relevant to the extent they resulted in that charge.  For purposes of recovering damages, at least, we do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.  If action is subsequently taken on the basis of that report, or if the report is disseminated in some manner, plaintiff's constitutional

---

[4] Although in the Memorandum Opinion issued in response to the Motion to Dismiss, the Court left open the possibility that the "lies" by School District officials in the November 2024 "Due Process Hearing" *could potentially* be the basis for Bryant's Section 1983 Due Process claim, review of the record shows that this cannot be the case. Bryant brought her IDEA Due Process Complaint against the District and obtained a determination that the District did commit a procedural violation of Hoskins's IEP.  She does not appear to challenge this result.  Nor can the Court identify any deprivation suffered by Bryant as a result of the purported "lies" by the testifying officials.  The testimony Bryant called into question during the hearing was not material to the substance of her complaint or the findings by the hearing officer.

rights may well then be violated, and in that event a section 1983 action may lie.  The focus, however, ordinarily should be on the consequences, if any, not on the mere existence of the report."

*Id.* at 744-45; *see also Bush v. City of Philadelphia*, 1999 WL 554585, at \*4-6 (E.D. Pa. July 15, 1999) (surveying cases and finding no civil rights violation for filing false police reports in the absence of evidence of resulting harm to plaintiff).

Here, there is no evidence that the existence of the report harmed Bryant—she did not face wrongful arrest, she was not charged, she was not even the subject of the report, nor was it even classified as a criminal matter.  Because the report alone is not a Due Process violation, Defendants' argument prevails, and summary judgment must be granted on this claim.

### B.  Section 504 Retaliation

Section 504 of the Rehabilitation Act guarantees that children with disabilities will not be denied an education because of their disability, providing that "[n]o otherwise qualified individual with a disability" may, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  The Section 504 implementing regulations, 34 C.F.R. § 100.7(e), also prohibit retaliation—intimidation, threats, coercion, or discrimination—for making a complaint or participating in a hearing to enforce these rights.

Bryant's claim appears to be that the District retaliated against her for enforcing her son's Section 504 rights, specifically, that eight days after she filed an IDEA Due Process Complaint against the District, it retaliated against her by filing the "false" police report.  A retaliation claim under the Rehabilitation Act requires a plaintiff to show that: "(1) that they engaged in a protected activity;" (2) "that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights;" and, (3) "that there was a causal connection

8

between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Defendants do not contest that Bryant engaged in a protected activity, in this case the enforcement of her son's Section 504 and IDEA rights by filing her September 12 Complaint. And while they contest the falsity of the police report, Defendants do not challenge the premise that a false police report *could* "deter a person of ordinary firmness from exercising his or her rights." Instead, Defendants argue that the two are not causally linked—the call to the police was precipitated by Hoskins's continued absence and not by any retaliatory purpose.

The causation element requires a plaintiff to produce some evidence to support a plausible inference that the protected activity was "a substantial or motivating factor" in the challenged retaliatory action. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). That showing may be made through: (1) "temporal proximity" between the protected activity and the adverse action; (2) "a pattern of antagonism" following the protected conduct; or, (3) other facts which, viewed as a whole, support an inference of retaliatory animus. *DeFlaminis*, 480 F.3d at 267; *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (temporal proximity and pattern of antagonism "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference."). Here, the temporal proximity of eight days between Bryant's IDEA Complaint and the District's call to the police is sufficiently suggestive of a causal link.

If a plaintiff makes the requisite showing of causation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged action. *See Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir. 1997). The defendant's burden at this stage is one of production, not persuasion; it need only identify evidence which, if credited, would permit a

9

factfinder to conclude that the action was taken for reasons unrelated to the plaintiff's protected activity. *Id.* Once the defendant does so, the presumption of retaliation drops from the case, and the plaintiff must point to evidence from which a reasonable factfinder could either disbelieve the defendant's proffered explanation or conclude that retaliation was more likely than not a motivating or determinative cause of the adverse action. *Id.* at 501; *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284-86 (3d Cir. 2000).

Here, Defendants have overcome the presumption of retaliation. The *only* evidence is that the District acted out of concern for Hoskins's safety when it contacted the police. When Stein called the police, Hoskins had already been missing for two weeks, and the District had run through the other tools it had to hand to try and locate him. District employees had previously contacted Bryant, but she was disinclined to share information with them—not giving them a clear answer on whether Hoskins had returned home, whether she knew where he was, or whether she had contacted the police herself. The District had just obtained new information leading it to believe that Hoskins was alive and well, and supplied that information to the police in the hope that it would assist them in any effort they were making to locate him. There is no evidence that would allow a reasonable factfinder to find that this proffered explanation is untrue or that the police report was made with any retaliatory purpose.

### C.  Qualified Immunity

Separate from the Defendants' arguments on the Section 1983 and Section 504 claims, Lucas also argues that she is entitled to qualified immunity for the federal claims against her in her individual capacity. This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Stringer*

*v. Cty. of Bucks*, 141 F.4th 76, 84 (3d Cir. 2025) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity shields the government official—who bears both the burden of pleading the qualified immunity defense, *see Stringer*, 141 F.4th at 86, and the burden of persuasion, *see Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011)—unless (1) they violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct. *Reichle v. Howards,* 566 U.S. 658, 664 (2012). District courts have discretion as to the order in which to address the two-part test. *Egolf v. Witmer,* 526 F.3d 104, 110 (3d Cir. 2008).

Here, as discussed above, there is no evidence that there was a violation of Bryant's rights under either Section 1983 or Section 504. Because there was no violation of rights, the inquiry need not proceed any further. Lucas is entitled to qualified immunity on both claims.

### D. Defamation

In order to succeed on a defamation claim under Pennsylvania law, a plaintiff must establish: (1) the challenged communication was defamatory; (2) it was published by the defendant; (3) it concerned the plaintiff; (4) its recipient understood the statement's defamatory character; and, (5) the recipient understood it as intended to be applied to the plaintiff. *Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001) (citing 42 Pa. C.S. § 8343(a)). A communication is defamatory if it tends to harm another's reputation by lowering that person in the estimation of the community or deterring others from associating or dealing with that person. *Tucker*, 237 F.3d at 282 (quoting *Corabi v. Curtis Publishing Co.*, 273 A.2d 899, 904 (Pa. 1971)). But the statement must do more than merely embarrass or annoy the plaintiff; it must provoke "'the kind of harm which has grievously fractured [one's] standing in the community of respectable society.'" *Tucker v. Phila. Daily News,* 848 A.2d 113, 124 (2004) (quoting *Scott-Taylor, Inc. v.*

11

*Stokes,* 229 A.2d 733, 734 (1967)).  A statement does not become defamatory merely because it is false, objectionable, embarrassing, or annoying.  *Id.*

Although Bryant does not identify the claimed defamatory statement in her complaint, nor does she expound on what defamatory meaning she believes it conveyed reading her Complaint through an expansive lens, her claim could be based on the statement in the Lower Pottsgrove Township police report that "Hoskins hasn't been in school since 09/06/2024 . . . . [and] Bryant . . . was not forthcoming with information on where [Hoskins] was."  Although the statement to the police was not made by Lucas herself, Bryant alleges that it was made at her direction, and Lucas does not challenge this.  Instead, she raises the affirmative defense of substantial truth.[5]

Even where a communication is capable of defamatory meaning, a defendant may defeat a defamation claim by establishing that the challenged statement was "substantially true."  *See* 42 Pa. C.S. § 8343(b)(1); *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982) ("The proof of truth must go to the gist or sting of the defamation.") (internal quotation omitted); *Bobb v. Kraybill*, 511 A.2d  1379, 1380-81 (Pa. Super. 1986) (at summary judgment the inquiry is whether "there exists a genuine issue of material fact as to the substantial truth" of the statements).  Substantial truth does not require proof of literal accuracy in every detail. *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014).  Rather, the defendant must show that the statement's "gist or sting" was true.  *Dunlap*, 448 A.2d at 15.  Because an allegedly

---

[5] Defendants also raise the additional defense of privilege, citing a Third Circuit case for the proposition that there is a conditional privilege for statements made to police for the purposes of "preventing or detecting crime," requiring a showing of actual malice.  But the case they cite in support of this, *Myers v. Med. Ctr. of Del.*, 105 F. App'x. 403, 409 (3d Cir. 2004), is an unpublished interpretation of *Delaware* defamation law.  Although there is an analogous principle under Pennsylvania law, granting a privilege against defamation for statements made at "any stage of judicial proceedings," *see Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. 1991), Defendants do not support, through argument or analogy, why the statement made to the police here, even if not made for judicial purpose or to prevent or prosecute a crime, should fall within this privilege.

defamatory statement must be considered in context, however, a defendant may not rely on isolated literal accuracy where the communication, viewed as a whole, conveys a materially false implication. *Baker v. Lafayette Col.*, 532 A.2d 399, 402 (Pa. 1987); *Dunlap*, 448 A.2d at 15.

Here, the statement "Bryant was not forthcoming with information" was substantially true, supported by the undisputed evidence. Emails and testimony detail several instances in which school district employees asked Bryant if she had contacted the police or if Hoskins was back home, including: (1) the September 11, 2024 email in which Lucas asked "Is Dayontae back home?"; (2) a subsequent email the same day "Is Dayontae back home with you now is my immediate concern . . . if he is safe and at home there is no reason for us to follow-up . . ."; and, (3) Lucas's testimony from the Due Process Hearing that she and other District employees had asked Bryant on multiple occasions if Dayontae had returned home and that Bryant did not directly respond to those questions. Each time, Bryant did not address the District's inquiries, instead asking questions of her own about what had happened and what steps the District was taking to locate her son. Thus, the characterization is a fair one; Bryant was not "forthcoming," meaning she was not responsive or open with the District. *See forthcoming,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/forthcoming (last visited July 15, 2026).[6]

---

[6] Nor is the statement capable of a defamatory meaning, although Defendants do not raise this point. However, "[i]t is for the court to determine, in the first instance, whether the statement of which the plaintiff complained is capable of a defamatory meaning." *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990).

Here, the statement itself does not suggest that Bryant generally was a "bad mother," only that she was not interested in answering the School District's questions. Nor does the statement accuse Bryant of lying, concealing a crime, obstructing an investigation, neglecting her child, or engaging in any other unlawful or seriously discreditable conduct. Although the statement may portray that the District felt that Bryant was unhelpful or uncooperative—and therefore may be unwelcome or embarrassing for Bryant—that is not, without more, sufficient to lower her reputation in the estimation of the community or deter others from associating or dealing with her. *See Tucker*, 237 F.3d at 282; *see also Beverly Enter., Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999) (quoting *Kryeski v. Schott Glass Techn., Inc.*, 626 A.2d 585, 601 (Pa. Super. 1993)) ("[S]tatements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory.").

### E. False Light

Bryant's Pennsylvania state claim for false light invasion of privacy is also presumptively based on the same statement in the Lower Pottsgrove Police Department report. To succeed on this claim, she must show that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136. "The required standard of fault in a false light claim is . . . actual malice." *Rubin v. CBS Broadcasting Inc.*, 170 A.3d 560, 568 n.9 (Pa. Super. 2017).

A false-light invasion-of-privacy claim protects "the interest of the individual in not being made to appear before the public in an objectionable false light." *Curran v. Children's Serv. Ctr. of Wyoming Cnty., Inc.*, 578 A.2d 8, 12 (Pa. Super. 1990) (internal quotations and citations omitted). Accordingly, the "publicity" required for a false-light claim is distinct from the "publication" element of a defamation claim. *Id.* To establish publicity, a plaintiff must show that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.*; *see also Fanelle v. Lojack Corp.*, 2000 WL 1801270, at *9 (E.D. Pa. Dec. 7, 2000) ("false light requires 'publicity,' meaning widespread dissemination, as opposed to mere 'publication' under defamation.").

Defendants are correct that they did not "publicize" the statement at issue—Stein made a limited disclosure to the police. While it is true that the information could theoretically be accessed by a member of the public if he or she sought that information through a Right-to-Know request, that is a far cry from widespread dissemination or communication to the public at large.

Nor is there evidence that Lucas acted with actual malice—the statement in question was not made with the knowledge of its falsity or with a reckless disregard for the truth. The only

14

evidence in the record is that, when Lucas instructed Assistant Principal Stein to contact the police, she did so as part of the school's efforts to locate Hoskins and ensure his safety.

### F. Intentional Infliction of Emotional Distress

Bryant's final claim against Lucas is for intentional infliction of emotional distress. Under Pennsylvania law, intentional infliction of emotional distress requires "'intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff' and 'some type of resulting physical harm due to the defendant's conduct.'" *Davis v. Wigen*, 82 F.4th 204, 216 (3d Cir. 2023) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. 2005)).  For conduct to rise to this level, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)).

Lucas's primary argument is that none of the conduct alleged by Bryant meets this high standard.  And she is correct.  Liability attaches only "for only the most clearly desperate and ultra extreme conduct." *Hoy*, 720 A.2d at 754.  It "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987) (quoting Restatement (Second) of Torts § 46 cmt. d). The court must determine, as an initial matter, whether the defendant's conduct meets this threshold. *Johnson v. Caparelli*, 625 A.2d 668, 671 (Pa. Super. 1993).  Here, there are two possible predicates for Bryant's claim: the "false" police report and Lucas's "lies" at the November 2024 Hearing.  Neither is sufficient.

With respect to the claimed lies at the Due Process Hearing, although Bryant does not identify in her Complaint which statements she believes were not truthful, a close review of the

15

record reveals two times during the hearing when Bryant accused Lucas of lying. The first involved how Hoskins came to be enrolled with the District for the 2024-2025 school year, and the second was Lucas's testimony that she could not recall the sequence or exact substance of the emails and phone calls she exchanged with Bryant shortly after Hoskins went missing.

While it is clear that Bryant found both of these exchanges extremely upsetting, the claimed misstatements described above do not approach the exceptionally demanding level of conduct required to establish intentional infliction of emotional distress under Pennsylvania law. Even accepting Bryant's characterization that Lucas was "playing word games," giving evasive, inaccurate, or even knowingly false testimony during an adversarial administrative hearing, is not enough. Without additional evidence of threats, coercion, or similarly aggravated misconduct, they are incapable of satisfying the high bar for extreme and outrageous conduct under Pennsylvania law. *See Hoy*, 720 A.2d at 754; *Kazatsky*, 527 A.2d at 991. The conduct described above is not "so atrocious and utterly intolerable" as to exceed "all possible bounds of decency," *Hoy*, 720 A.2d at 754, but instead is the type of "ordinary indignities, annoyances, or petty oppressions," that are incapable of supporting a claim for intentional infliction of emotional distress, *Kazatsky*, 527 A.2d at 991.

Nor is the report to the Lower Pottsgrove Police Department concerning Hoskins's extended absence sufficient, even if the report was false, and even if it accused Bryant of criminal conduct, which it did not. Courts in Pennsylvania have consistently held that "false allegations of criminal conduct [alone] simply are not sufficiently extreme to give rise to tort liability for intentional infliction of emotional distress." *Velardo v. Lewko*, 2019 WL 5095657, at *12 (M.D. Pa. Aug. 22, 2019) (collecting cases). It is only if that false allegation leads to something more—if it is "acted upon by the authorities to the detriment of a plaintiff"

16

such as through a criminal indictment or false arrest—that courts have found a false report capable of sustaining an intentional infliction of emotional distress claim. *Id.* Here, there is no additional detrimental act, and the report itself, even if very upsetting for Bryant, is not extreme or outrageous conduct.

Because neither category of conduct—the alleged lies, nor the purportedly false police report—is sufficiently extreme and outrageous, summary judgment must be granted for Lucas.

***

An appropriate Order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____
WENDY BEETLESTONE, C.J.

17